**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br><br>ITEM DESCRIBED IN ATTACHEMENT A<br><br>IN CUSTODY OF UNITED STATES<br>FEDERAL BUREAU OF INVESTIGATION,<br>601 4TH ST NW, WASHINGTON, DC | Mag. No. |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION
UNDER RULE 41 FOR A WARRANT TO SEARCH**

I, Tonya Sturgill Griffith, Special Agent with the Federal Bureau of Investigation (FBI), of the Washington Field Office (WFO), Washington D.C., (hereinafter the "affiant") being duly sworn, depose and state the following:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for the authorization to examine and extract electronically stored information contained in a mobile telephone. The electronic device (hereinafter **Target Device**) to be searched is described further in the following paragraphs and Attachment A.

2. I have been employed as a Special Agent of the FBI since February 2002 and am currently assigned to the Washington Field Office Child Exploitation Task Force. Since joining the FBI, I have investigated violations of federal law involving organized crime, drug trafficking, extra-territorial crime and terrorism and I currently investigate federal violations concerning child pornography and the sexual exploitation of children. I have gained experience through training and work related to conducting these types of investigations.

## BASIS FOR FACTS CONTAINED IN THE AFFIDAVIT

3. The statements in this affidavit are based in part on information provided by the U.S. Probation Office for the Eastern District of Virginia and my own investigation of this matter. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the item described in Attachment A may contain contraband and evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 2252(a)(4)(B) and (b)(2) (possession of and access with intent to view a visual depiction of a minor engaged in sexually explicit conduct) and 18 U.S.C. §§ 2252A(a)(5)(B) and (b)(2) (possession of and access with intent to view child pornography).

## IDENTIFICATION OF THE TARGET DEVICE TO BE EXAMINED

4. The property to be seized and forensically searched is a black LTE cell phone belonging to Robert Bruce Taylor Sr. ("defendant") which was seized from the defendant at while he was residing at Hope Village, a residential halfway house located in Washington, DC.

5. The phone is currently located in the offices of the Federal Bureau of Investigation, Washington Field Office, 601 4th St NW, Washington DC. It was previously in the possession of Robert Bruce Taylor Sr. and provided to the FBI by Hope Village staff.

## RELEVANT STATUTES

6. As noted above, this investigation concerns alleged violations of the following:

    a.    Title 18, United States Code, Sections 2252(a)(4)(B) prohibits any person from knowingly possessing or accessing with the intent to view, or attempting or conspiring to possess or access with the intent to view, 1 or more books, magazines, periodicals, films, video tapes, or other matter which contain any visual depiction that has

been mailed, or has been shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, or which was produced using materials which have been mailed or so shipped or transported, by any means including by computer, if the production of such visual depiction involved the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct. These provisions carry enhanced penalties for individuals who have prior convictions for, among other violations, receipt of child pornography under Title 18, United States Code, 2252A(a)(2).

  b. Title 18, United States Code, Section 2252A(5)(B) prohibits a person from knowingly possessing or knowingly accessing with intent to view, or attempting or conspiring to do so, any material that contains an image of child pornography, as defined in 18 U.S.C. § 2256(8), that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer. These provisions carry enhanced penalties for individuals who have prior convictions for, among other violations, receipt of child pornography under Title 18, United States Code, 2252A(a)(2).

## RELEVANT DEFINITIONS

7. The following definitions apply to this Affidavit:

  a. IP Address: The Internet Protocol address (or simply "IP") is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every

computer (including smart phone cellular devices) that are attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

      b.      The Internet is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

      c.      "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can. In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext. This is usually done with the use of an encryption key, which specifies how the message is to be encoded. Any adversary that can see the ciphertext should not be able to determine anything about the original message. An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

      d.      "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website.

  e. "Child Erotica" means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions.

  f. "Child Pornography" means the definition in 18 U.S.C. § 2256(8) (any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct), as well as any visual depiction, the production of which involves the use of a minor engaged in sexually explicit conduct. *See* 18 U.S.C. §§ 2252 and 2256(2)(8).

  g. "Computer" means "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device." *See* 18 U.S.C. § 1030(e)(1).

  h. "Internet Connection" means a connection required for access to the Internet. The connection would be provided by cable, DSL (Digital Subscriber Line) or satellite systems.

  i. "Internet Service Providers" or "ISPs" mean commercial organizations which provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can

offer various means by which to access the Internet including telephone based dial-up, broadband based access via a digital subscriber line (DSL) or cable television, dedicated circuits, or satellite based subscription. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth that the connection supports. Many ISPs assign each subscriber an account name such as a user name or screen name, an e-mail address, and an e-mail mailbox, and the subscriber typically creates a password for the account. By using a computer equipped with a telephone or cable modem, the subscriber can establish communication with an ISP over a telephone line or through a cable system, and can access the Internet by using his or her account name and password.

   j. "Minor" means any person under the age of eighteen years. *See* 18 U.S.C. § 2256(1).

   k. "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any persons. *See* 18 U.S.C. § 2256(2).

   l. "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image. *See* 18 U.S.C. § 2256(5).

## FACTS ESTABLISHING PROBABLE CAUSE

8. On March 29, 2012, Robert Bruce Taylor pled guilty to receipt of child pornography, in violation of Title 18, U.S.C., Section 2252(a)(2) before Judge T.S. Ellis III of the United States District Court for the Eastern District of Virginia. See *United States v. Taylor*, No.

1:12-cr-00017-TSE (E.D. Va).

9. The Statement of Facts accompanying his plea, which Taylor stipulated was true, indicated Taylor was downloading images of child pornography via a peer-to-peer file sharing network. A search was conducted by the FBI on Taylor's residence in October, 2011 where numerous items of digital media, as well as color printed photographs of child pornography, were seized. While the forensic review of the seized items was ongoing in November, 2011, Fairfax County Police discovered Taylor was again utilizing peer-to-peer file sharing networks to obtain images of child pornography. A second search warrant was executed on Taylor's residence by the FBI in December, 2011, and additional printed color photographs of child pornography were seized along with several new digital media devices. Forensic review by a computer forensic examiner of all devices seized revealed that Taylor had in his possession at least 600 videos and over 2000 still images of child pornography.

10. Taylor's guilty plea was the result of that conduct. On August 9, 2012, Taylor was sentenced to 80 months incarceration to be followed by five years of supervised release. The Court ordered several special conditions of supervised release, including that the defendant not possess pornographic material and that the defendant comply with the requirement of the Computer Monitoring Program as administered by the Probation Office.

11. Prior to his release on October 3, 2017, to begin his term of Supervised Release, Taylor was residing at Hope Village. On April 27, 2017, Taylor signed an Acknowledgement of Receipt of Resident Rules and Regulations, Terms and Conditions, and Waiver, which indicate that among other restrictions, residences were forbidden to be in possession of smart phones.

12. On October 4, 2017, the defendant's probation officer notified Detective Timothy Palchak with the Metropolitan Police Department and Federal Bureau of Investigation Child

Exploitation Task Force that a smartphone with child pornography images observed by a staff member had been seized from the defendant while he was residing at Hope Village residential halfway house. During an initial interview, Taylor indicated to the Probation Officer that he received the phone from another resident and did not download the images, but was aware the images were on the phone.

13. Based on this information, this affiant met with the Administrative Director of Hope Village and obtained the seized cell phone and a copy of the incident report. Per the report, on September 26, 2017, a staff member of Hope Village was conducting a routine room check and observed Taylor utilizing a smart phone, in violation of the Resident Rules and Regulations of Hope Village. The staff member observed "inappropriate photographs" of teen girls on the phone and called supervisors to assist with the situation. During subsequent interviews on October 26, 2017, one staff member indicated he saw images of girls he estimated to be between 3 to 6 years of age depicted in images on defendant's smartphone. The staff member described the images as full body photographs of the girls fully nude. The staff member also saw images of minor girls in cheerleader uniforms with their breasts exposed and legs spread open, exposing their vaginas. Due to the fact that the girls were not fully developed and had very young looking faces, the staff member estimated the girls were between 14-17 years of age.

14. The **Target Device** is currently in the lawful possession of the FBI and is currently in storage at the FBI office in Washington, D.C., a location within the District of Columbia. In my training and experience, I know that the **Target Device** has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the **Target Device** first came into the possession of the FBI. For the reasons set forth below, I respectfully submit there is probable cause to believe that evidence of the defendant's

intent to receive and/or possess child pornography will be located on the **Target Device**.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

15. Based on my training and experience, computer, smart phone, and other digital device files, or remnants of such files, can be recovered months or even years after they have been downloaded onto an electronic storage medium, deleted, or viewed via the Internet. Electronic files downloaded to an electronic storage medium can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a digital device such as a home computer or a smart phone, the data contained in the file does not actually disappear; rather, that data remains on the electronic storage medium until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the electronic storage medium that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve "residue" of an electronic file from an electronic storage medium depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

16. Records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital devices are, as described further in Attachment

B, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data on the electronic storage media not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use. Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

17. Forensic evidence on a cellular phone can also indicate who has used or controlled the cellular phone. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the cellular phone at a relevant time.

18. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on storage media, like cellular phones, that are necessary to draw an accurate conclusion, is a dynamic process. While it is possible to specify in advance the records to be sought, electronic storage media and digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on electronic storage media or digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

19. I know that when an individual uses a digital device to display or access information pertaining to sexual activity with children, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The digital device is also likely to be storage medium for evidence of crime. From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

20. ***Methods To Be Used To Search Digital Devices***. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

    a. Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time. There

11

are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals, specialized equipment, and software programs necessary to conduct a thorough search. Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

   b.  Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. Recovery of "residue" of electronic files from electronic storage media also requires specialized tools and often substantial time. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

   c.  The volume of data stored on many digital devices will typically be so large that it will be extremely impractical to search for data during the physical search of the premises. Smart phones capable of storing 64 gigabytes, flash drives capable of storing 128 gigabytes, and desktop computers capable of storing 500 or more gigabytes are now commonplace. Consequently, just one device might contain enormous amounts of data.

d. Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data or software on a digital device is not able to be segregated from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

e. Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Digital device

users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

    f.  Analyzing the contents of mobile devices can be very labor intensive and also requires special technical skills, equipment, and software. The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device. Additionally, most smart phones and other mobile devices require passwords for access. For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode. Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer. Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many. For example, one such mobile application, "Hide It Pro," disguises itself as an audio

application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

   g. Based on all of the foregoing, I respectfully submit that searching the **Target Device** pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the media or devices. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

   h. In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

     1. The analysis of the contents of the **Target Device** may entail any or all of various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic

"keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

    2.    In searching the seized **Target Device**, the forensic examiners may examine as much of the contents of the electronic storage media or digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B. In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B. Any search techniques or protocols used in searching the contents of the seized electronic storage media or digital devices will be specifically chosen to identify only the specific items to be seized under this warrant.

## CONCLUSION

21. Based upon these facts, there is probable cause to believe that there are fruits and evidence of offenses involving violations of Title 18, United States Code, Sections 2252(a)(2) (receipt of child pornography) and 2252(a)(4)(B) (possession of child pornography) which will be found within the seized cellular phone as further described in Attachments A and Attachments B.

    22.    Based upon the foregoing, I respectfully request that this Court issue a search warrant for the **Target Device**, more particularly described in Attachment A, authorizing the seizure of the items described in Attachment B.

                                                      _____
Tonya Sturgill Griffith
Special Agent
Federal Bureau of Investigation

Sworn and subscribed before me
this 31st day of October 2017.

_____
Deborah A. Robinson
United States Magistrate Judge